IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WENDY M. HARRIS, | ) | CASE NO. 3:20-CV-1956 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Wendy Harris ("Plaintiff" or "Harris"), challenges the final decision of Defendant, Kilolo

Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Period of

Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI")

under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C.

§ 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND

REMANDED for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

In July 2018, Harris filed applications for POD, DIB, and SSI, alleging a disability onset date of

May 5, 2017 and claiming she was disabled due to: degenerative disc disease, depression, PTSD,

hypertension, hypothyroidism, Vitamin D deficiency, low back pain, and urinary incontinence.  Transcript

("Tr.") at 207, 203, 239.  The applications were denied initially and upon reconsideration, and Harris

requested a hearing before an administrative law judge ("ALJ").  Tr. 135.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On September 30, 2019 an ALJ held a hearing, during which Harris, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 35-65.  On October 29, 2019, the ALJ issued a written decision finding that Harris was not disabled.  Tr. 15-29.  The ALJ's decision became final on July 22, 2020, when the Appeals Council declined further review.  Tr. 1-3.

On September 1, 2020, Harris filed her Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 17, 19, 20.  Harris asserts the following assignment of error:

> The ALJ failed to adequately evaluate claimant's spinal impairments at Steps 2 and 3 of the sequential evaluation.

Doc. No. 17, p. 2.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Harris was born in 1972 and was 44 years old on her alleged disability onset date, making her a "younger" person under social security regulations.  Tr. 28.  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has at least a high school education and is able to communicate in English.  Tr. 28.  She has past work as a licensed practical nurse.  Tr. 28.

### B.    Relevant Medical Evidence[2]

On April 21, 2017, Harris went to the emergency room following an automobile accident and complained of injuries to her head, low back, and chest.  Tr. 325-328.  Upon exam she had mild low back pain, a steady gait, and normal strength, range of motion, balance, and coordination.  Tr. 326-327.

On June 26, 2017, Harris visited Mercy Health to establish care for her physical and psychiatric complaints, including hypertension, hypothyroidism, anxiety, and drug and alcohol abuse.  Tr. 504-505.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

She denied experiencing numbness, weakness, or musculoskeletal symptoms. Tr. 504.

On August 2, 2017, Harris visited her doctor for hematuria and low back pain. Tr. 501. Upon exam, she had low back tenderness and negative straight leg raise testing. Tr. 502. She was prescribed ibuprofen and counseled on the importance of exercise. Tr. 502.

On September 19, 2017, Harris went to the emergency room complaining of right upper quadrant abdominal pain radiating to her back for the last three days. Tr. 465. She denied a gait disturbance, weakness, and numbness. Tr. 479. Upon exam, she had abdominal tenderness, a normal range of motion in her spine, intact strength, normal reflexes and sensation, and a normal gait. Tr. 466, 471, 477, 479. She had an abdominal and pelvic ultrasound and CT scan, which showed gallbladder abnormalities and grade I anterolisthesis at L5-S1 secondary to bilateral L5 pars interarticularis defects and associated posterior element hypertrophy, degenerative disc disease at L5-S1 with vacuum disc phenomenon, degenerative spurring and discogenic sclerosis. Tr. 528.

On June 1, 2018, Harris saw Muhammad Shah, M.D., reporting lower bilateral back pain radiating to her bilateral hips that had been ongoing for several months. Tr. 453-455. She had no focal neurological deficits or weakness. Tr. 455. Her review of symptoms was positive for back pain and negative for arthralgias, gait problems, and joint swelling. Tr. 455. Upon exam, she had tenderness in her bilateral lower lumbar region, normal range of motion, and negative straight leg raise testing. Tr. 455. She was diagnosed with degenerative disc disease at L5-S1 and obesity and referred to physical therapy. Tr. 455-456.

On October 15, 2018, Harris saw her primary care physician Sufyan Malik, M.D., to follow up for her hypertension, incontinence, and bilateral lower extremity edema. Tr. 697-698. Dr. Malik noted that Harris had been to urology and was diagnosed with mixed overactive bladder and urge incontinence and had been advised to continue her medication. Tr. 698. She denied back pain. Tr. 698. On October

3

17, Harris called Dr. Malik's office to complain of the diagnosis that Dr. Malik had indicted on her disability paperwork, stating that she has degenerative disc disease.  Tr. 697.  She wanted her paperwork filled out again "and put that right now she can not work."  Tr. 697.  Dr. Malik replied that he would not change her form and wrote, "[d]egenerative disc disease does not prevent her from doing a desk job."  Tr. 697.

On December 3, 2018, Harris went to the emergency room for chest pain; she had a normal range of motion in a musculoskeletal exam, no tenderness, and normal reflexes, muscle tone, and coordination.  Tr. 638, 641.  She denied back pain or gait problems.  Tr. 639.  At follow up appointments with her doctor she denied back pain and gait problems and had a normal range of motion.  Tr. 678, 683.

On January 14, 2019, Harris had x-rays of her lumbar spine that showed mildly straightened lumbar lordosis, grade I spondylolisthesis of L5 on S1 resulting in narrowing of the neural foramen at that level, and multi-level degenerative disc disease and facet arthropathy.  Tr. 964.  In February, Harris began physical therapy for her chronic low back pain with sciatica, left foot pain, and Achilles tendonitis.  Tr. 963.  She was discharged in April after 14 visits, reporting that her pain symptoms seem to have been relieved but that she still felt "a 'heaviness' and was limited with mobility for community distances."  Tr. 1023.  She would do her home exercises and was to see a neurologist soon to follow up on her remaining symptoms.  Tr. 1023.

On February 19, 2019, Harris saw Dr. Ahmad for a follow up of her medical problems, including radiating back pain, numbness and tingling.  Tr. 947.  She denied gait problems.  Tr. 952.  Upon exam, she had a decreased range of motion in her back and tenderness, deformity, pain and spasm.  Tr. 953.  She had normal strength and a sensory deficit.  Tr. 953.  Dr. Ahmad prescribed gabapentin.  Tr. 953.

On March 3, 2019, Harris went to the emergency room for chest pain, nausea and vomiting;

4

upon exam of her extremities she had a full range of motion and a neurological exam showed intact

motor function and sensation.  Tr. 826.  She denied focal weakness, loss of sensation, and gait

disturbance.  Tr. 864, 880, 881, 888.

On May 7, 2019, Harris saw Dr. Carmela Gonzales, M.D., at Mercy Health Multiple Sclerosis

Center for an evaluation for lower extremity numbness and tingling for the last 10 years.  Tr. 1139.  Her

symptoms were intermittent, stem from her low back, and radiate to both legs, left more than right.  Tr.

1139.  She had associated muscle spasms and weakness.  Tr. 1139.  She could not walk more than 25-30

feet or her legs will give out.  Tr. 1139.  She also reported urinary incontinence for the last 3 years; she

had been diagnosed with mixed incontinence but no longer took her medication because it caused dry

mouth.  Tr. 1139-1140.  The last six months she had also noticed intermittent tingling of her right arm

and leg when she first stands up.  Tr. 1140.  Upon exam, she had an adequate range of motion in her

back, normal muscle bulk and tone, full strength in all extremities, decreased sensation to light touch

and pinprick on her left upper and left lower extremities, intact fine motor movement and no involuntary

movements, and her gait had a normal base and arm swing.  Tr. 1145.  Dr. Gonzales ordered MRIs of

Harris' brain and cervical and thoracic spine to evaluate for possible demyelinating disease.  Tr. 1146.

On May 22, 2019, Harris had a thoracic and cervical spine MRI due to her complaints of

headaches, right arm and leg weakness, unsteady gait and difficulty walking for the past 1.5 years.  Tr.

1-93.  The result of the thoracic MRI was minor degenerative disc disease, including multilevel facet

hypertrophic changes, mild or minimal disc bulges at every level except at level T5, and, at T12-L1, a

broad-based central and right paracentral protrusion with ventral distal cord flattening.  Tr. 1094.  The

result of the cervical spine MRI was multilevel degenerative disc disease, including minimal to mild disc

bulging at all levels, and, at levels C5-6 and C6-7, endplate and facet hypertrophic changes, no canal

narrowing or significant canal narrowing, and mild minimal ventral cord flattening.  Tr. 1094.

5

On June 19, 2019, Harris saw Dr. Rayeesa Ahmad, M.D., for a follow up of her hypertension, obesity, and low back pain.  Tr. 1075.  Harris reported that she had done physical therapy but it had not helped and she wanted an MRI.  Tr. 1075.  She had seen a neurologist to be evaluated for multiple sclerosis but her brain and thoracic MRI were normal.  Tr. 1075.  She endorsed arthralgia, back pain, gait problem, joint swelling and myalgia.  Tr. 1081.  Upon exam of her lumbar spine, she had a decreased range of motion, tenderness, bony tenderness, deformity, pain and spasm.  Tr. 1082.  Dr. Ahmad diagnosed spinal stenosis and ordered a lumbar MRI.  Tr. 1083.  Dr. Ahmad provided a prescription for a walker to be used daily for walking.  Tr. 1083, 1179.

On June 28, 2019, Harris had a lumbar spine MRI that showed severe bilateral foraminal narrowing at L5-S1 secondary to grade II bilateral spondylolysis, multilevel degenerative changes, and low-lying cord/conus possibly secondary to height loss related to spondylolisthesis.  Tr. 1091.  Specifically, from L1-L5, circumferential disc bulges with facet ligamentum flavum hypertrophy were present; at L3-L4 there was effacement of the bilateral descending L4 nerve roots in the lateral recess, mild spinal canal narrowing, and moderate bilateral neural foraminal narrowing; at L5-S1 there was moderate to severe canal narrowing secondary to bilateral spondylolysis with spondylolisthesis, effacement of the cauda equina, and severe bilateral neural foraminal narrowing.  Tr. 1090-1091.

On July 2, 2019, Harris followed up with Dr. Gonzales at Mercy Health Multiple Sclerosis Center.  Tr. 1116.  Harris reported that her symptoms were persistent.  Tr. 1116.  She had been using a wheeled walker recently and was able to walk about a half a mile before she had to stop and sit down.  Tr. 1116.  The tingling in her legs was intermittent and lasted about 30-60 seconds with no clear trigger and she also had baseline urinary incontinence.  Tr. 1116.  Upon exam, her back range of motion was adequate, she had normal muscle bulk and tone, full strength, decreased sensation to light touch and pinprick on her left upper and left lower extremity, intact reflexes, and her gait had a normal base and

6

arm swing.  Tr. 1123.  Dr. Gonzales stated that the MRI results did not show evidence of demyelinating disease and noted that Harris had been referred to neurosurgery and that no further neurological workup was recommended.  Tr. 1123.  She counseled Harris on the importance of regular exercise.  Tr. 1123.

On July 30, 2019, Harris saw Dr. Zubair Ahammad, D.O, at Mercy Toledo Neurosurgery for a consultation for her leg weakness and axial heaviness in her lumbar spine.  Tr. 1183.  Harris reported that her legs had given out on her at times and that she had been using a walker the last year or so.  Tr. 1183.  She also complained of intermittent, radiating numbness and pain down both legs in the posterior aspect that comes and goes and worsened with forward flexion.  Tr. 1183.  She endorsed daily episodes of urinary incontinence for the past 3 years when she is seated without any straining and has loss of urine.  Tr. 1183.  She denied saddle anesthesia but endorsed worsening constipation over the last six months.  Tr. 1183.  Upon exam, she had intact sensation, full muscle strength, and normal reflexes.  Tr. 1188.  Dr. Ahammad assessed Harris with spondylolisthesis L5-S1 level and lumbar stenosis with neurogenic claudication.  Tr. 1188.  Dr. Ahammad wrote that Harris had "clear symptoms of claudication.  Despite the incontinence it has been stable and going on for 3 years at this point."  Tr. 1188.  He recommended smoking cessation and bariatric surgery for weight loss, which she was "already in the pipeline for."  Tr. 1188.  She was to return in December 2019 for lumbar flexion and extension x-rays to reevaluate for surgery once she had stopped smoking and lost weight.  Tr. 1188.  Meanwhile, if she had worsening symptoms, including bowel/bladder incontinence or saddle symptoms, she was to return sooner.  Tr. 1188.

## C.    State Agency Reports

On September 28, 2018, state agency reviewing physician Sreenivas Venkatachala, M.D., evaluated Harris' physical impairments.  Tr. 75-76.  Dr. Venkatachala did not consider whether Harris satisfied the criteria of any physical listings.  Tr. 74.  Regarding Harris' RFC, Dr. Venkatachala opined

that Harris could perform light work with restrictions on her ability to perform postural activities.  Tr. 74-76.  On January 8, 2019, Rannie Amiri, M.D., considered whether Harris satisfied the criteria of Listing 1.04, but concluded that she did not.  Tr. 98.  Dr. Amiri affirmed Dr. Venkatachala's opinion regarding Harris' RFC, explaining that Harris had a normal gait, negative straight leg raise testing, and decreased range of motion in her lumbar spine.  Tr. 100.  Dr. Amiri added a restriction that Harris should avoid workplace hazards.  Tr. 98-101.

**D.    Hearing Testimony**

During the September 30, 2019 hearing, Harris testified to the following:

- She lives with her girlfriend, her son, and her son's girlfriend.  Tr. 40.  She has a driver's license and drives on a regular basis.  Tr. 41.

- She last worked in 2017 as a licensed practical nurse.  Tr. 41.  She worked as a nurse for 14 years.  Tr. 45.  She stopped working because of her drug addiction; she took time off and became sober but then her back problems gradually got worse.  Tr. 45.

- She started having back problems in 2003 and started getting treatment for it in May 2017.  Tr. 45-46.  She had physical therapy in 2019 for 3 months.  Tr. 47.  Otherwise, she had a gap in treatment between 2017 and 2019 because "it was the doctor's decision to make."  Tr. 47.  She regularly reported to her doctor that she had pain and they put her on gabapentin, which is a narcotic, and which was not beneficial.  Tr. 47.  She did not get a second opinion.  Tr. 47.  Her pain level was between a 5 and 8.  Tr. 47.

- In 2019 she became unable to walk a long distance without a walker.  Tr. 48.  She can walk 30-50 feet without it.  Tr. 48.  Her walker was prescribed by her family physician, Dr. Ahmed, in June 2019.  Tr. 48.

- She developed urinary incontinence in June 2017 that has been getting worse.  Tr. 50.  She saw a urologist who put her on medication, but the medication caused side effects and it did not resolve her incontinence so she stopped taking it.  Tr. 50-51.  She is not seeing any provider for that problem because she doesn't know what they can do for it, other than back surgery.  Tr. 51.  She believes it is caused by her back problem.  Tr. 51.  When asked if a provider has told her that, she answered no, but explained, "from the results, that it's cutting off the nerves.  To the lower half of my body."  Tr. 54.  Sometimes she urinates without any notification that she has to urinate.  Tr. 51.

- She is pursuing bariatric weight loss surgery and has an upcoming appointment to complete the dietician aspect of that surgery and she has already stopped smoking, another prerequisite for her surgery.  Tr. 53.  She has an appointment in December with her

neurosurgeon; if she has healed from her bariatric surgery she will be evaluated for back surgery.  Tr. 54.

- Her back symptoms include a heaviness in the middle, where her back and legs meet, and weakness.  Tr. 54.  She also has pain in both legs.  Tr. 54.  The last couple of years it has been getting worse; the pressure is worse when she stands up and the numbness and tingling are also worse.  Tr. 55.
   .

The VE testified that Harris has past work as a licensed practical nurse.  Tr. 58.  The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Harris could perform her past work or any other work if the individual had the following residual functional capacity: she could perform a full range of light work except she can frequently climb ramps or stairs but never ladders, ropes or scaffolds; can frequently crouch, occasionally stoop, and never kneel or crawl; and can never be exposed to unprotected heights.  Tr. 58.  The VE testified that the hypothetical individual would not be able to perform Harris' past work but could perform other jobs in the economy.  Tr. 58-59.  The ALJ asked the VE if there were jobs the hypothetical individual could perform if she were limited to work in the sedentary range and the VE answered that such an individual could perform the following jobs: document preparer, addresser or address clerk, and surveillance system monitor.  Tr. 60.  When asked about normal breaks, absenteeism, and off-task behavior, the VE stated that normal breaks are two 10-15-minute breaks and a 30-40-minute lunch, and that an individual could not miss more than one half to one day of work a month or be off-task more than 10-12% of the workday.  Tr. 60-61.

Harris' attorney asked the VE whether the individual's use of a walker for ambulation would impact the jobs he identified and the VE stated that such an individual could not perform jobs at the light level of exertion.  Tr. 62.  Harris' attorney confirmed that one of the jobs the VE identified—document preparer—was defined as relating to microfilming and the VE stated that it was.  Tr. 62.  When asked when that job had last been updated in the Dictionary of Occupational Titles, the VE answered that it

had last been updated in 1990.  The VE explained that that job was an alternative and that he updates the skill set, language and terminology to "marry" how the job is described in the DOT and how it is performed in today's market.  Tr. 62-63.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve

10

months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Harris was insured on the earliest possible disability onset date, May 5, 2017, and remained insured through December 31, 2022, her date last insured ("DLI."). Tr. 15. Therefore, in order to be entitled to POD and DIB, Harris must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since May 5, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, obesity, and coronary artery disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

11

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can frequently climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can frequently crouch. She can occasionally stoop. She can never kneel and crawl. She can never be exposed to unprotected heights.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on October **, 1972 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 5, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17-29.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip*

12

*v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

13

Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

Harris argues that the ALJ erred at step three when he found that her spinal impairments did not rise to a listings level impairment because the ALJ evaluated the wrong listing.[3]  Doc. No. 17, pp. 13-14. Instead of evaluating her spinal impairment pursuant to Listing 1.04, disorders of the spine, the ALJ evaluated her spinal impairment pursuant to Listing 1.02, major dysfunction of a joint.  Harris did not allege she has, nor is there evidence of, a major dysfunction of a joint.  Harris asserts that there is "no correlation between [her] allegations of disability resulting from spinal conditions and the ALJ's detailed discussion as to why [she] does not meet a Listing that is directed to dysfunction of major weight bearing joints."  Doc. No. 17, p. 14.

Defendant concedes that the ALJ evaluated Harris' spinal impairment according to the wrong listing but asserts that Harris' challenge to the ALJ's decision lacks merit "because she failed to produce evidence that fulfilled all of the criteria for a disabling listed spinal impairment."  Doc. No. 19, pp. 7-8. Defendant argues that, to prevail, Harris must establish "a substantial question" as to whether she was disabled under Listing 1.04, identify "specific evidence that demonstrates that she reasonably could meet or equal every requirement of the listing," and submits that Harris does not do so.  Doc. No. 19, p.

---

[3] Harris' argument that the ALJ erred at step two when he found "only one severe impairment as it relates to [her] spinal column: degenerative disc disease of the lumbar spine" and not her other, spinal-related diagnoses fails because the ALJ evaluated her spinal diagnoses when assessing her RFC.  Doc. No. 17, pp. 11-13; Tr. 23-24. S*ee Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider all impairments when assessing an RFC).

8.  Defendant states that the ALJ's "thorough analysis of the evidence related to Plaintiff's gait and neurological functioning is sufficient basis for this Court to uphold the ALJ's step three non-disability finding."  Doc. No. 19, p. 10.

> Listing 1.04 is:
>
> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> ***
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1.[4]

Harris asserts that she satisfies the diagnostic definition of Listing 1.04—a disorder or a spine resulting in compromise of a nerve root or the spinal cord.  Doc. No. 17, pp. 15-16; Doc. No. 20, pp. 7-8.  Defendant does not counter that argument.  Rather, Defendant argues that Harris does not point to evidence showing that she can satisfy the additional criteria in Listing 1.04 A or C.  Defendant asserts that, elsewhere in his decision, the ALJ "clearly pointed out that [Harris] failed to produce evidence of the kind of abnormalities that are required to satisfy this listing, such as motor weakness, muscle atrophy, sensation loss, reflex abnormalities, and limited range of motion."  Doc. No. 19, pp. 8-9 (citing Tr. 26).  Thus, Defendant argues, "given the overwhelmingly benign clinical evidence regarding Plaintiff's strength, sensation, reflexes, range of motion, and straight leg raise testing, Plaintiff cannot reasonably show that she met or medically equaled all of the criteria of Listing 1.04(A)."  Doc. No. 19,

---

[4] Listing 1.04(B) involves spinal arachnoiditis, which does not apply to Harris.

15

p. 9.

In support of their arguments, both sides cite unpublished opinions favoring their positions. Harris relies upon *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011) and *Harvey v. Comm'r of Soc. Sec.*, 2017 WL 4216585 (6th Cir. Mar. 6, 2017), two cases in which the ALJ concluded the claimant's physical impairments did not satisfy a listing at step three but provided no explanation. In *Reynolds*, the Court found that the ALJ's step three error was not harmless because "it is possible that the evidence Reynolds put forth could meet this listing." 424 F. App'x at 416. In *Harvey*, the Court reversed the district court's finding that the ALJ's decision at step three was harmless. The ALJ had concluded, without explanation, that the claimant did not satisfy Listing 1.02. The Court identified evidence in the record that could support the criteria of Listing 1.02 and wrote, "the district court should not have speculated [by looking elsewhere in the opinion] what the ALJ may have concluded had he considered the medical evidence under the criteria in Listing 1.02." 2017 WL 4216585, at *6 (citing *Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016)). The Court concluded,

> Moreover, we will not apply a harmless error review to the ALJ's omission because the district court engaged in fact-finding to resolve this issue. *Chenery Corp.*, 332 U.S. at 196. When an ALJ fails to make a determinative and necessary finding of fact in a sequential step, a reviewing court should not "fill that gap." *See Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008). Because the ALJ committed an error of law, we must vacate and remand, "even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different." *Reynolds*, 424 Fed.Appx. at 414 (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed.Appx. 852, 859 (6th Cir. 2011)).

*Id.* at *7.

Defendant relies upon different cases. In *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014), the ALJ failed to consider Listing 12.05C, intellectual disability. The Court stated, "neither the listings nor the Sixth Circuit require the ALJ to address every listing or to discuss listings that the applicant clearly does not meet." *Id.* "The ALJ should discuss the relevant listing, however, where the record raises a substantial question as to whether the claimant could qualify as

disabled under a listing.  *Id*. (cleaned up, quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990),

*Sheeks, v. Comm'r of Soc. Sec*., 544 Fed. App'x 639, 641 (6th Cir. 2013)).  The Court explained,

> A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a "substantial question" as to whether he has satisfied a listing. *Sheeks*, 544 Fed.Appx. at 641–42 (finding claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a listing and where claimant pointed to only a few pieces of tenuous evidence addressing the listing). Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing. *See Sullivan*, 493 U.S. at 530, 110 S.Ct. 885 ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of the criteria, no matter how severely, does not qualify."); *Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir.2001) (claimant must satisfy the diagnostic description and one of the four sets of criteria); *see also Reynolds v. Comm'r of Soc. Sec*., 424 Fed.Appx. 411, 416 (6th Cir.2011) (holding that it was not harmless error for the ALJ to fail to analyze Step Three as to an impairment found to be severe at Step Two where the claimant put forth evidence that possibly could meet the relevant listing).[] Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

*Id*. at 432-433.  Because the ALJ did not discuss Listing 12.05, the Court considered "whether the record

evidence raises a substantial question as to Smith–Johnson's ability to satisfy each requirement of the

listing."  *Id*.  After weighing the evidence, the Court found that the claimant had not "pointed to any

record evidence that raises a substantial question as to whether she satisfied the diagnostic definition."

*Id*. at 433-436.  The Court rejected the claimant's argument that it was performing a post-hoc

rationalization of the ALJ's step three analysis, reasoning,

> Undoubtedly, there is a fine line between a post-hoc rationalization and a determination as to whether the record evidence raises a substantial question.  Yet, it is proper for the court to evaluate whether the findings and opinions of the mental-health professional that Smith–Johnson contends supports a disability determination raises a substantial question.  It also is proper to consider the ALJ's evaluation of the mental-health assessment of Koopman at other steps of his decision to determine how to credit the evidence at issue in this appeal.

*Id*. at 435.

In *O'Brien v. Comm'r of Soc. Sec*., 819 Fed. App'x 409, 415 (6th Cir. 2020), also cited by

Defendant, the Court considered whether the ALJ erred when he found that the claimant did not satisfy

the criteria in Listing 1.04(A).  Affirming, the Court stated, "We agree that because there is no evidence of nerve-root compression (accompanied by motor loss and positive straight-leg raising tests in both the sitting and supine position), spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, the evidence does not support a finding that O'Brien's impairments meet or are equivalent to this Listing."  *Id*.  And in *Bailey v. Comm'r of Soc. Sec.*, 413 Fed. App'x 853, 855 (6th Cir. 2011), the Court rejected the claimant's argument that she could medically equal Listing 1.04(A) when she did not have either nerve root or spinal cord compression, observing that she did not demonstrate "a lack of motor strength, a lack of sensory functions, and a positive straight-leg raising test, among other things."  But both *O'Brien* and *Bailey* involved challenges to the ALJ's reasoned explanation regarding why the claimant failed to satisfy Listing 1.04—here, the ALJ didn't evaluate whether Harris satisfied Listing 1.04 at all.

Defendant also cites *Forrest v. Comm'r of Soc. Sec.*, 591 Fed. App'x 359, 365 (6th Cir. 2014), and *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x 639, 641 (6th Cir. 2013).  Doc. No. 19, p. 8.  But in those cases, the Court took pains to note that the claimants had never argued before the ALJ that they satisfied the listing they challenged on appeal.  *Id*. at 641 ("In defense of the ALJ, Sheeks did not mention the listing in the administrative proceeding.  He raised it for the first time at the district court and has stayed the course in pressing it here."); *Forrest*, 591 Fed. App'x at 365.  Here, in contrast, Harris argued to the ALJ that her lumbar spine impairment was "listing level severity."  Tr. 39-40 (Hearing).

Thus, the Court is left with two relevant, unpublished Sixth Circuit opinions: *Harvey*, which counsels against a court speculating upon how an ALJ would decide a listing issue that was not evaluated, and *Smith-Johnson*, which permits a court to consider whether the record evidence raises a substantial question as to the claimant's ability to satisfy each requirement of a listing not evaluated by

18

an ALJ.  The Court finds that the facts of this case are more in line with the facts in *Harvey*, and, therefore, concludes that remand is warranted.

First, the court in *Smith-Johnson* relied on the fact that there was insufficient evidence that the claimant satisfied the diagnostic definition of Listing 12.05, intellectual disability or borderline intellectual functioning.  579 Fed. App'x at 433-435.  Here, Harris asserts, and Defendant does not dispute, that she satisfies the diagnostic definition of Listing 1.04, "disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord."

Next, the ALJ in *Smith-Johnson*, when assessing the claimant's RFC, had discussed and relied upon two pieces of opinion evidence (including one by an examining physician) concluding that the claimant did not have an intellectual disability, and the Court analyzed those opinions and agreed with the ALJ that both supported the view that the claimant did not have an intellectual disability.  *Id.* at 434-435.  Here, the ALJ cited the state agency reviewing opinions but did not discuss them, other than commenting that they had limited Harris to light work.  Tr. 27.  Neither provided an explanation for whether Harris satisfied Listing 1.04.[5]  The ALJ also commented that Dr. Lalor, a physician who evaluated Harris for bariatric surgery, "indicated that the claimant had no functional impairments and suggested the claimant's back pain was not disabling."  Tr. 27.  That statement is not supported by the treatment note the ALJ had previously cited for that visit, Exhibit 21F/2 (Tr. 24, 26).  There is no opinion, indication, or obvious suggestion contained in that treatment note and the ALJ did not explain how that treatment note supports a finding that Harris does not meet or equal Listing 1.04.

Finally, additional errors are contained in the ALJ's decision.  As Harris points out (Doc. No. 17,

---

[5] Dr. Venkatachala did not consider Listing 1.04.  Dr. Amiri did but provided no reasons for concluding that Harris did not satisfy it.  When evaluating Harris' symptoms, Dr. Amiri stated that she did not have an assistive device, but Dr. Amiri's review occurred prior to Harris receiving a prescription for an assistive device.  Tr. 98-99.

p. 15), the ALJ stated, "[t]here is no evidence to support the claimant's testimony that her need for a walker or a wheelchair has been prescribed by Dr. Ahmad" (Tr. 22) and that there was "no record of the use of an assistive device" (Tr. 24).  But Dr. Ahmad did prescribe a walker (Tr. 1083, 1179).  Next, the ALJ described Harris' neurosurgeon, Dr. Ahammad, as having recommended conservative treatment (Tr. 24), but Dr. Ahammad had recommended that Harris return in six months for lumbar flexion and extension x-rays to reevaluate for surgery once she had stopped smoking and lost weight after her bariatric surgery.  Tr. 1188.  Since then, Harris had stopped smoking and was nearing her bariatric surgery date to achieve weight loss.  Tr. 53.  The ALJ ignored the fact that Dr. Ahammad considered surgery a potential option for Harris' "significant" lumbar stenosis and "clear symptoms of claudication."  Tr. 1188.  Lastly, Dr. Ahammad referenced Harris' incontinence, indicating it was caused by her lumbar spine impairment.  Tr. 1188.  That may be evidence of motor loss, a finding relevant to Listing 1.04A.

In sum, Harris has shown that she meets the diagnostic criteria of Listing 1.04, disorders of the spine.  In addition, there is some evidence in the record of neuro-anatomic distribution of pain (back and leg pain), limitation of motion of the spine, and possible motor loss (incontinence) accompanied by sensory loss.  Thus, she has shown more than a "mere toehold in the record on an essential element of" Listing 1.04.  *Sheeks*, 544 Fed. App'x at 642.  Although there is involvement of the lower back and Harris did not have positive straight leg raise testing, the ALJ must evaluate whether Harris meets *and* medically equals Listing 1.04A.  *Harvey*, 2017 WL 4216585, at *7 ("When an ALJ fails to make a determinative and necessary finding of fact in a sequential step, a reviewing court should not 'fill that gap.'").  And while the ALJ considered Harris' ability to ambulate effectively as defined in 1.00B2b (an element of 1.04C) when he erroneously evaluated Harris' spinal impairment under Listing 1.02, on remand, the ALJ will have an opportunity to reconsider that issue and Harris' prescription for a walker.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

IT IS SO ORDERED.


Date: October 27, 2021                          *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge